**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARYAM KHAN ET AL., Plaintiffs, v. CITY OF HARTFORD ET AL., Defendants. | : | 3:24-CV-01120 (SFR) |

**MEMORANDUM & ORDER**

Plaintiffs Maryam Khan ("Khan"), Sarah Khan, Jane Doe 1, Jane Doe 2, and John Doe bring this action against the City of Hartford and three employees of the Hartford Police Department ("Individual Defendants") in relation to an attack on Maryam Khan that occurred as she was leaving Eid prayers at the XL Center in Hartford on June 28, 2023.

In Count One, Plaintiffs assert that the City of Hartford and the Individual Defendants violated Khan's Fourth and Fourteenth Amendment rights under the U.S. Constitution. Counts Two and Three assert state law claims against the City of Hartford: Counts Two alleges the City of Hartford negligently failed to protect Plaintiffs and Count Three alleges the City of Hartford breached a contractual duty to provide security to the attendees at the Eid prayers. Defendants have moved to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons stated below, Defendants' Motion to Dismiss is granted. Count One is dismissed with prejudice and without leave to amend. With the federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Counts Two and Three are dismissed without prejudice to refiling in Connecticut state court.

# I. BACKGROUND

## A. Factual Background

The following allegations from the Second Amended Complaint ("SAC") are taken as true for the purposes of this Opinion. *See* SAC, ECF No. 34. On June 28, 2023, Maryam Khan, a member of the Connecticut General Assembly, survived a serious physical assault in front of the XL Center in downtown Hartford immediately after Eid al-Adha services. SAC ¶ 1.

The Islamic Center of Connecticut had contracted with the City of Hartford to use the XL Center on June 28, 2023, from 7:00am-1:00pm for the services for its members. *Id.* ¶ 43. The contract included that the City of Hartford would provide adequate security for the event's approximately 1,500 attendees. *Id.* ¶ 44. The Islamic Center of Connecticut agreed to pay the City of Hartford $3,000 plus reimbursable expenses estimated at $6,000. *Id.* ¶¶ 45, 46.[1] Under the contract, the City was obligated to have one police officer inside the XL Center from 8am to 11am and three patrolling officers outside of the XL Center from 7:30am to 11:30am. *See id.* ¶ 102.

The SAC alleges that on the day of the event, when attendees were exiting the arena following the services, there were no Hartford Police Department ("HPD") officers or XL Center security patrolling the area despite contractual obligations to provide security. *Id.* ¶ 47. According to the SAC, the City of Hartford "removed the officers outside of the XL Center prior to 11:00am." SAC ¶ 103. The Individual Defendants left their duties early, leaving the congregants without protection. *Id.* ¶¶ 48, 90-92.

[1] The SAC alleges on information and belief that the Islamic Center of Connecticut paid the City of Hartford the money owed under the contract. SAC ¶ 46.

Khan, who is a Muslim woman and a member of the Islamic Center of Connecticut, was taking pictures of her children when Andrey Desmond came toward her family and started harassing them. *Id.* ¶ 49. Desmond threatened to sexually assault Khan in front of her three children, sister, and female friend. *Id.* ¶ 50. Khan sent her children to safety with her sister inside and led Desmond back outside in front of the XL Center's entrance, getting him away from her children and others in the XL Center. *Id.* ¶ 51.

Just outside the XL Center entrance, when Khan refused Desmond's sexual advances, he forcefully slapped her face and put his arm around her neck to prevent her from escaping while he dragged her in a chokehold. *Id.* ¶ 52. Multiple attendees of the event were leaving the services and witnessed the assault. Desmond extended his other arm while holding Khan in a chokehold, pointing his hand in the shape of a gun toward the men trying to intervene. *Id.* ¶ 53. When one of the men finally got close to Desmond to try to stop him, Desmond slammed Khan's body to the ground. *Id.* ¶ 54. Desmond was pushed away from Khan by a good Samaritan. *Id.* ¶ 55. Desmond attempted to return to the scene to continue his attack three times. It took two men to stop him, catch him, and hold him until police finally arrived to arrest Desmond. *Id.*

As a result of the attack, Khan suffered a concussion, persistent loss of sensation and numbness in her right shoulder and arm, and several bruises and cuts on her face and body. *Id.* ¶ 56. Khan also suffered severe emotional distress from the "physical assault and attempted sexual assault and continues to seek treatment" for this distress. *Id.* ¶ 57. Khan's children and sister also suffer severe emotional distress from witnessing the attack. *Id.* ¶ 58.

At the time of the attack, there were no HPD officers or private security detail patrolling the area despite their obligation to do so. *Id.* ¶ 6. It took several minutes for Hartford Police

officers to arrive on the scene despite Khan and others yelling numerous times inside and outside the XL Center. *Id.* ¶ 8. After officers arrived, they had Khan, despite visible injuries, walk several blocks for a show-up identification, rather than allowing medical attention and "a non-suggestive identification procedure." *Id.* ¶ 60. Although Khan was offered quick medical attention, she was only given an ice pack for her injuries and the medics did not recommend she go to the hospital for further evaluation, despite the fact that she had been physically attacked by the assailant and sustained clear injuries. *Id.* ¶ 15.

According to the SAC, at the scene, Khan "reported in detail that she was sexually assaulted by Desmond." *Id.* ¶ 61. Officers omitted those details from the police report and did not include those details in an initial public statement about the assault. *Id.* Internal emails show that following the attack, the City of Hartford was aware of the allegation that there were not enough police officers protecting the congregants. *Id.* ¶ 62.

Later, the incident was covered by national news outlets and the HPD provided the police report to media before Khan received a copy. *Id.* ¶¶ 20, 63. According to the SAC, the HPD provided "biased and skewed information" to the media. *Id.* ¶ 25. The SAC states that the police report "completely ignored" Khan's report of sexual assault, instead focusing more on the actions of the good Samaritan who assisted Khan—portraying him as an assailant. *Id.* ¶¶ 21, 63. The SAC asserts on information and belief that HPD "diminished the sexual-assault report and limited information about the attack while knowing it bore responsibility for XL Center security at the time." *Id.* ¶ 64.

Khan confronted the HPD Police Chief regarding the police report. The Police Chief "defended that this was the normal way of completing a report" and did not agree that the information regarding the sexual assault was necessary. *Id.* ¶¶ 23, 65. When Khan asked that

the police report be corrected, the Police Chief stated the report was correct as is. *Id.* ¶ 23. In a later communication with the Police Chief, Khan repeated that she had complained of "Desmond's threat of sexual assault" and had injuries in the neck area that should have justified a more thorough medical examination. *Id.* ¶ 69. According to the SAC, the Police Chief responded that these details did not change what he felt were the appropriate charges. *Id.* The Police Chief said he did not think the facts met the threshold of a sexual assault. *Id.* ¶ 70. The SAC says the Police Chief stated that although he knew Desmond said "I want to have sex with her or them," that did not change the charge to sexual assault. *Id.*

The SAC asserts on information and belief that it was only after Khan went to the prosecutor herself that "any consideration of charges for sexual assault against Desmond were discussed." *Id.* ¶ 66.

The SAC alleges on information and belief that the City of Hartford and the HPD have "a history of denying adequate protection to Plaintiff's class of women of the Muslim faith." *Id.* ¶ 26. The SAC asserts that actions towards Khan are, on information and belief, "part of the systemic pattern of discrimination by HPD against women of color" *Id.* ¶ 27. In addition, "[l]ike with Plaintiff Khan, HPD treats religious minorities differently than other individuals who attend sporting and special events at City-owned facilities." *Id.* ¶ 28.

The SAC makes various further allegations against the HPD on information and belief. In particular, the SAC asserts on information and belief that in 2024, the HPD failed to act on complaints of public nuisance and harassment by three women of color who were members of a family residing in Hartford. *Id.* ¶ 71. On information and belief, "HPD officer identified and described the female complainants as 'snitches' to the offending parties, intimidating the

female victims from seeking police protection and investigation as a result of the 'doxxing' by HPD officers." *Id.* ¶ 72.

The SAC also asserts on information and belief that a 2019 HPD Internal Affairs investigation found a hostile work environment against an LGBT female HPD officer, forcing her to resign. *Id.* ¶ 74. The SAC states on information and belief that HPD officials engaged in retaliation against a lieutenant as result of his advocacy for equal treatment for the female officer. *Id.* ¶ 75.

The SAC also states on information and belief that an HPD officer was under investigation for engaging in a sexual relationship with an underage girl when he was arrested in April 2019. *Id.* ¶ 76. The SAC says on information and belief that a HPD internal affairs report indicates that the officer was suspended without pay in October 2019 after he was accused of using his service weapon to beat a man he found with the underage girl while off duty. *Id.* ¶ 77. The SAC also states the Court may take judicial notice of a 2023 Connecticut Supreme Court decision regarding discrimination against a probationary officer of Vietnamese ancestry by a former sergeant employed by HPD in a supervisory role. *Id.* ¶ 78.[2]

The SAC further alleges on information and belief that the HPD routinely staffs multi-officer details and robust security coverage for baseball games at Dunkin' Park well after the game has ended as fans leave the stadium. *Id.* ¶ 80. The SAC says on information and belief

---

[2] The SAC states that "in 2023, the Connecticut Supreme Court ruled that the HPD discriminated against a probationary officer of Vietnamese ancestry . . . through a former sergeant employed by the HPD in a supervisor role." SAC ¶ 78. However, the Connecticut Supreme Court did not make a finding of discrimination. Instead, the Court concluded that substantial record evidence supported the *referee's* finding of intentional discrimination. *Hartford Police Dep't v. Comm'n on Hum. Rts. & Opportunities*, 347 Conn. 241, 275 (2023).

that adequate security is provided before, during, and after sporting events and other large entertainment events at Dunkin' Park, Dillon Stadium, and the XL Center, and yet the June 28, 2023 Eid event for approximately 1,500 attendees was left without exterior posts before the contracted end time. *Id.* ¶ 82. The SAC states on information and belief that congregants were not allowed to carry their own protection at the XL Center, not even a can of mace, thus making them beholden to contracted security at such events. *Id.* ¶ 81.

According to the SAC, the City of Hartford's "policy and practice provided greater police presence for commercial sports/entertainment than for a large Islamic religious gathering of predominately people of color, evidencing disparate allocation of protective resources on the basis of religion and race." *Id.* ¶ 82.

The SAC alleges that in Fiscal Year 2023, the City appropriated over $500,000 to provide security for events at the Hartford Stadium and Dillon Stadium, "signaling a priority for stadium events that is not afforded to a protected class like Muslims at a similar weekday event." *Id.* ¶¶ 83-84. The SAC also alleges that XL Center's governing body's board minutes report numerous events at the stadium requiring police presence. *Id.* ¶ 85.

### B. Procedural History

Plaintiffs initiated this action when they filed their Complaint in this Court on June 27, 2024. Compl., ECF No 1. On August 12, 2024, Plaintiffs filed their First Amended Complaint ("FAC"), ECF No. 14.

On September 2, 2025, I issued an Opinion granting Defendants' Motion to Dismiss the FAC, and providing leave to file an amended complaint. ECF No. 33. On October 6, 2025, Plaintiffs filed the currently operative SAC against the City of Hartford, and three Hartford Police Officers: Corey L. Clark, Gerald D. Morgan, and Rodney Harris. SAC, ECF No. 34.

On November 24, 2025, Defendants filed their Motion to Dismiss the SAC, along with a Memorandum of Law ("Defs.' Mem."), ECF No. 38-1. On December 15, 2025, Plaintiffs filed their Memorandum in Opposition ("Pls.' Mem."), ECF No. 39. On January 12, 2026, Defendants filed a Reply ("Defs.' Reply"), ECF No. 42.

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155-56 (D. Conn. 2016). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. I must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). However, I am not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

## III. DISCUSSION

Count One of the SAC asserts Fourth and Fourteenth Amendments claims by Maryam Khan against the City of Harford and the Individual Defendants. Count Two asserts negligence claims by all Plaintiffs against the City of Hartford. Count Three asserts breach of contract claims by all Plaintiffs against the City of Hartford.

### A. Count One: Fourth and Fourteenth Amendment Claims

In Count One, the SAC alleges that the City of Hartford and the Individual Defendants violated Khan's Fourth and Fourteenth Amendment Rights. SAC ¶¶ 86-99.

#### 1. Fourth Amendment Claim

The title of Count One references the Fourth Amendment but none of the allegations in the SAC appear connected to the Fourth Amendment. Defendants argue that since the SAC does not allege any search or seizure by government agents it does not state a claim for a Fourth Amendment violation. Defs.' Mem. 3-4. Plaintiffs respond by asserting only that the "Defendants violated M. Khan's Fourth and Fourteenth Amendment Rights through discrimination and violation of substantive due process and equal protection under the law." Pls.' Mem. 7. Because the SAC describes no search or seizure by any government employee, I agree with Defendants.

To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a federal right. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). The Fourth Amendment provides:

> The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967)). The SAC has not alleged any invasion of privacy or security by governmental officials but

instead describes an attack by a private individual and alleges government officials failed to prevent the attack. Accordingly, the SAC fails to state a claim for a Fourth Amendment violation against Defendants. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (stating that the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official") (citation modified).

Accordingly, I dismiss the SAC's Fourth Amendment Claim with prejudice and without leave to amend. *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").

**2. Fourteenth Amendment Substantive Due Process Claim**

In Count One, the SAC asserts a substantive due process claim based on Defendants' failure to protect Khan from an assault by a private individual when she left the XL Center event. SAC ¶ 98. Defendants argue that the SAC does not state a claim for a substantive due process violation because it fails to allege facts showing an exception to the general rule that the government does not have a constitutional obligation to protect citizens from private harms. Defs.' Mem. 5-8. In response, Plaintiffs argue that the City of Hartford created an increased risk to event attendees by assuring them there was protection, preventing them from bringing their own protection, and then stripping away the promised protection. Pls.' Mem. 7-8. I conclude that the SAC has failed to allege a substantive due process violation.

Government entities and officials are generally not liable for the failure to protect an individual from harm inflicted by a private party. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197 (1989) ("As a general matter, [] we conclude that a State's

failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). However, there are two narrow exceptions to this rule when: (1) there is a "special relationship" between the governmental entity or official and the harmed party or (2) the governmental entity or official "created" the danger that caused the harm. *See Pena v. DePrisco*, 432 F.3d 98, 108-09 (2d Cir. 2005). Because Khan alleges that a private individual attacked her, not any government official, she can meet the government-action requirement of a substantive due process claim only if she satisfies one of the two exceptions. In addition, "[i]n order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* at 112 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

**a. Special Relationship Exception**

Plaintiffs argue in conclusory terms that the SAC alleges "a special relationship." Pls.' Mem. 8. However, Plaintiffs provide no specific argument on this issue and cite no case law. *Id.* Defendants assert that the Court should deem this argument abandoned. Defs.' Reply 2. I decline to find the argument abandoned but reject it on the merits.

As the Second Circuit has explained, "[t]he special relationship exception grows from the *DeShaney* Court's observation that 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.'" *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (quoting *DeShaney*, 489 U.S. at 198). Under limited circumstances, "the state may owe the incarcerated person an affirmative duty to protect against harms to his liberties inflicted by third parties" but "the duty arises solely from 'the State's affirmative act of restraining the individual's

freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty.'" *Id.* at 156 (quoting *DeShaney*, 489 U.S. at 200) (citation modified); *see also id.* ("Our own opinions have also focused on involuntary custody as the linchpin of any special relationship exception."); *Lombardi v. Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007) ("Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment.").

Here, the SAC does not allege that Khan's movement was restrained or restricted by Defendants. The SAC does assert on information and belief that congregants were not permitted to "carry their own protection," including mace, at the XL Center. SAC ¶ 81. But Plaintiffs point to no cases finding a special relationship under comparable circumstances. Here, attendees voluntarily attended the event and were not placed in involuntary custody or otherwise restrained. Even if the XL Center had rules prohibiting attendees from carrying mace or weapons, such a restriction does not establish a "special relationship" as attendees could choose whether to remain in the building and be subject to its rules. *See Brown v. City of New York*, 786 F. App'x 289, 293 (2d Cir. 2019) ("[O]nce Brown elected to remain in a homeless shelter, she was required to abide by the shelter rules; she cannot establish a special relationship by claiming that the shelter's rules were too restrictive. . . . Because Brown failed to allege facts showing she was involuntarily held in custody, Brown failed to establish a special relationship."). Therefore, the SAC fails to allege a special relationship existed that created a constitutional duty for Defendants to protect attendees such as Khan.

**b. State-Created Danger**

Plaintiffs argue that the City of Hartford created an increased risk to event attendees by promising protection, preventing attendees from bringing their own protection, and then removing the officers who were supposed to provide protection. Pls.' Mem. 7-8.

"To warrant substantive due process liability under the state-created danger exception, a defendant must take affirmative action that 'communicates official sanction of private violence" to the perpetrator.'" *Brown*, 786 F. App'x at 292 (2d Cir. 2019) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009)) (citation modified). "The state-created danger analysis focuses on the State's affirmative interactions with the perpetrator, not the victim." *Id.*; *Lombardi*, 485 F.3d at 79 ("It is not enough [to constitute a substantive due process violation] to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger."). Because the SAC does not allege that Defendants took some affirmative action to facilitate or encourage Desmond's attack, the SAC's allegations do not satisfy the requirements for a state-created danger.

Accordingly, I grant Defendants' Motion to Dismiss as to Khan's Fourteenth Amendment substantive due process claims.

**3. Fourteenth Amendment Equal Protection Claims Against the Individual Defendants**

The SAC alleges that the Individual Defendants deprived Khan of her Fourteenth Amendment equal protection rights when they left their security duties outside of the XL Center early. SAC ¶ 90-92. Defendants argue that the SAC fails to allege facts supporting an inference of discriminatory intent and the officers are entitled to qualified immunity. Defs.'

Mem. 10-12. Plaintiffs respond that discriminatory intent may be inferred from the alleged actions and the officers are not entitled to qualified immunity. Pls.' Mem. 8-9. I agree with Defendants that the SAC fails to state a plausible equal protection claim against the Individual Defendants.

As the Second Circuit has explained, there are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000). To state a selective-treatment claim under the Equal Protection Clause, a plaintiff must plausibly allege (1) she was "selectively treated" compared to "others similarly situated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (citation modified). This type of equal protection claim requires "requires proof of disparate treatment and impermissible motivation." *Id.* (citation modified). "A plaintiff cannot merely rest on a demonstration of different treatment from persons similarly situated" but "must prove that the disparate treatment was *caused* by the impermissible motivation." *Id.* (citation modified).[3]

The Second Circuit has also recognized that intentionally withholding police services based on a person's membership in a protected class violates the Equal Protection Clause. *See Pyke v. Cuomo*, 258 F. 3d 107, 109 (2d Cir. 2001) (explaining the viability of a claim where plaintiffs "allege and establish that the defendants discriminatorily refused to provide police

[3] Courts refer to this type of claim as a *LeClair* claim as it was recognized by the Second Circuit in *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980).

protection because the plaintiffs are Native American”). To state such a claim, a plaintiff must show that the defendant acted with “discriminatory intent.” *Alba v. City of New York*, No. 23-CV-8619 (LAK) (BCM), 2025 WL 2420969, at *14 (S.D.N.Y. July 18, 2025), *report and recommendation adopted*, No. 23-CV-8619 (LAK), 2025 WL 2419573 (S.D.N.Y. Aug. 21, 2025) (quoting *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012)); *Patterson v. City of New York*, No. 16-CV-3525 (NGG) (SMG), 2017 WL 3432718, at *9 (E.D.N.Y. Aug. 9, 2017), aff’d, 758 F. App’x 217 (2d Cir. 2019) (describing such claims as “selective denial of services”).

Under either framework, the SAC has not stated a viable claim because the SAC has not plausibly alleged that the Individual Defendants acted pursuant to an impermissible motive. Indeed, the SAC contains no information about the Individual Defendants other than that they left their post early, apparently pursuant to some direction from others. *See* SAC ¶ 103 (stating that the City of Hartford “removed the officers outside of the XL Center prior to 11:00am”). The SAC thus fails to allege facts supporting a plausible inference that the Individual Defendants acted with discriminatory intent.

The Second Circuit has also recognized “class of one” equal protection claims. To prevail on such a claim, “a plaintiff must establish that he and a comparator are prima facie identical by showing that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.” *Hu*, 927 F.3d at 92 (citation modified).

Here, the SAC does not plausibly allege a "class of one" equal protection claim against the Individual Defendants. The SAC nowhere alleges any information at all about how the three Individual Defendants treated any other people.[4] The SAC's equal protection claims against the Individual Defendants thus cannot survive. *Wozar v. Campbell*, 763 F. Supp. 3d 179, 203 (D. Conn. 2025) (stating that "the complete absence of any alleged basis for equal protection violations, or reference to similarly situated people being treated differently, warrants the dismissal of this claim against all defendants") (citation modified).

Therefore, I dismiss the Fourteenth Amendment substantive due process and equal protection claims against the Individual Defendants with prejudice, as there is no indication that there are any additional facts relating to the Individual Defendants that would render their actions in leaving their security duties early unconstitutional. *See Lucente*, 310 F.3d at 258.

#### 4. Fourteenth Amendment Equal Protection Claim Against the City of Hartford

The SAC states in Count One that a *Monell* claim is asserted against the City of Hartford. SAC ¶ 87.

"To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citation modified). The standard established by the Supreme Court in *Monell v. Dep't of Social Servs*., 436 U.S. 658 (1978), governs § 1983 claims against municipalities. The Court in *Monell* determined that municipalities are

[4] Nor does the SAC allege any personal involvement by the three Individual Defendants in the alleged failure to properly investigate the attack on Khan. However, even if the Individual Defendants were the same officers who responded to the attack on Khan, the SAC still fails to provide any allegations that these particular officers treated similarly situated people differently.

"persons" within the meaning of § 1983 and the statute requires a causal connection between the actions of the municipality itself and the alleged constitutional violation. *See id.* at 691-92. Accordingly, "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. A "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees.").

A plaintiff may demonstrate a government "policy or custom" through "the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Gomez v. City of Norwalk*, No. 3:15-CV-01434 (MPS), 2017 WL 3033322, at *3 (D. Conn. July 17, 2017) (citation modified); *accord Jenkins v. City of Hartford*, No. 3:22-CV-01289 (KAD), 2024 WL 1157342, at *4 (D. Conn. Mar. 18, 2024).

A "*Monell* claim cannot succeed without an independent constitutional violation." *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022). Under *Monell*, a municipality can face suit under § 1983 only if it was the municipality's "failure to train, or the policies or customs that it has sanctioned, [that] led to [the] independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

Here, Plaintiffs argue that the City of Hartford has a "custom of discrimination against those similarly situated" to Khan and an "indifference to a group of individuals based on gender and religious practice and belief." Pls.' Mem. 9. Plaintiffs further assert that the SAC alleges a violation of Khan's "constitutional rights at the hands of HPD officers." *Id.* at 10.

However, as noted, the SAC fails to plausibly allege a violation of Khan's equal protection rights by the Individual Defendants. In addition, the SAC does not plausibly allege that any other HPD officer or municipal employee acted with intent to discriminate against her based on her gender, race, or religion. The SAC faults responding officers for having Khan walk several blocks for a show-up identification, failing to recommend that Khan seek further medical treatment, and failing to include details about the attempted sexual assault in the police report. SAC ¶¶ 12-19. However, these facts do not support a plausible inference that responding officers acted with discriminatory intent. Moreover, although the SAC faults the Police Chief for not correcting the police report and recommending a different charge against the assailant, SAC ¶¶ 23, 65-70, the SAC does not allege that the Police Chief himself acted with discriminatory intent—or provide facts that would support a plausible inference of discriminatory intent.

As the SAC fails to plausibly allege that any employee of the City of Hartford violated Khan's equal protection rights, the SAC cannot state a *Monell* claim against the City of Hartford.

Notably, even if the SAC plausibly alleged an employee of the City of Hartford violated Khan's equal protection rights, the SAC would still fail to state a plausible *Monell* claim. Plaintiffs do not argue that the City of Hartford is liable because a formal policy or actions or decisions by a final municipal policymaker caused a violation of Khan's rights. Instead, Plaintiffs argue that the HPD has a custom of discrimination against minority women and individuals of the Muslim faith and has shown deliberate indifference to the rights of these individuals. Pls.' Mem. 9.

The SAC states that "Defendant City had a duty to train its Police Department officers and employees to not discriminate against citizens on the basis of sex, as well as to properly investigate legitimate complaints of criminal activity and protect citizens under its jurisdiction from criminal activity." *Id.* ¶ 108. However, the SAC does not include any specific allegations about Hartford's failure to train its police department, the city's training practices, or how the lack of police training might have caused the attack on Khan. Thus, the SAC's allegations are insufficient to allege a *Monell* claim based on deliberate indifference.

A plaintiff may also establish a *Monell* claim by showing a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers. *Gomez* 2017 WL 3033322, at *3. "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007); *see*

*also Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992) ("So long as the discriminatory practices of city officials are persistent and widespread, they could be so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability.") (citation modified).

I previously granted Defendants' Motion to Dismiss Khan's *Monell* claim in the First Amended Complaint because it contained only conclusory statements about HPD's pattern of discriminatory behavior. *Khan v. City of Hartford*, No. 3:24-CV-01120 (SFR), 2025 WL 2532706 (D. Conn. Sep. 2, 2025). The SAC adds several more specific allegations. In particular, the SAC alleges, on information and belief, that in 2024, the HPD "failed to act on Complaints" of "public nuisance and harassment" from three women of color who are members of a family residing in Hartford, and a HPD officer dismissed the women as "snitches" to the offending parties thus intimidating them from seeking police protection. SAC ¶¶ 71-72. In addition, the SAC asserts on information and belief that in 2019, a HPD Internal Affairs investigation found a hostile work environment against an "LGBT female" HPD officer, and HPD officers retaliated against a lieutenant "as a result of his advocacy for equal treatment" for the female officer. *Id.* ¶¶ 74-75. The SAC, again on information and belief, states that another HPD officer, under investigation for a sexual relationship with an underage girl he arrested in April 2019, was suspended after he "beat a man he found with the underage female while off duty." *Id.* ¶ 77. Finally, the SAC states that a former HPD supervisor discriminated against a probationary officer of Vietnamese ancestry. *Id.* ¶ 78.

These incidents do not support a plausible inference that HPD had a custom of denying police protection to individuals on account of race, gender, religion. Two of the incidents involve claims of internal workplace discrimination. One involves alleged criminal activity by

an officer. These incidents do not involve a denial of police protection to members of the public on account of their membership in a constitutionally protected class. Although a final incident relates to an officer's response to complaints by women of color, there is no indication from the facts described in the SAC that the officer's actions were motivated by the race or gender of the complainants. In any event, an isolated incident does not suffice to establish a custom for purposes of a *Monell* claim.

Accordingly, the incidents alleged on information and belief in the SAC do not plausibly allege a pattern of misconduct "so permanent and well settled as to constitute a custom or usage with the force of law." *Sorlucco*, 971 F.2d at 870-71; *see also Pierce v. Town of Simsbury*, No. 3:20-CV-01766 (VAB), 2022 WL 4291389, at *5 (D. Conn. Sept. 16, 2022) (dismissing *Monell* claim and noting the absence of "complaints of civil rights violations that would have put defendants on notice about the propensity of their officers to engage in the kind of misconduct alleged by plaintiff here") (citation modified); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.").[5]

Accordingly, the SAC fails to state a plausible claim against the City of Hartford for an equal protection violation under the Fourteenth Amendment. Because the SAC fails to state an

[5] The SAC also alleges that "[u]pon information and belief, adequate security is provided before, during and after sporting events and other large entertainment events at Dunkin' Park, Dillon Stadium and XL Center yet the June 28, 2023 Eid event for approximately 1,500 attendees was left without exterior posts before the contracted end time." SAC ¶ 82. But the fact that HPD provides security at other events does not support a claim that the City of Hartford or HPD had a widespread custom or practice of denying police protection to individuals or groups based on gender, race, or religion.

equal protection claim against any particular employee of the City of Hartford, the City of Hartford cannot be liable. *Anilao*, 27 F.4th at 874 (stating that a "*Monell* claim cannot succeed without an independent constitutional violation"). Moreover, for the reasons discussed above, the SAC fails to state a plausible *Monell* claim against the City of Hartford. Thus, I grant Defendants' Motion to Dismiss the SAC's constitutional claims against the City of Hartford.

Count One is dismissed in its entirety with prejudice. *See Kpaka v. City Univ. of New York*, 708 F. App'x 703, 705 (2d Cir. 2017) (affirming dismissal with prejudice where plaintiff already had one opportunity to amend complaint).

### B. Counts Two and Three

Count One contains the only federal claims brought in this action. With no federal claims now remaining at this early stage in this case, I decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over Plaintiffs' state law claims. *See Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED. Count One is dismissed with prejudice and without leave to amend. The Court declines to exercise supplemental jurisdiction over the state law claims in Counts Two and Three. Counts Two and Three are dismissed without prejudice to refiling in Connecticut state court. The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

New Haven, Connecticut
September 18, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge